# IN THE UNITED STATES DISTRICT COURT

## FOR THE EASTERN DISTRICT OF VIRGINIA

### ALEXANDRIA DIVISION



| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | CRIMINAL NO. 1:10 cr 191 |
| | ) | |
| v. | ) | |
| | ) | Count 1 - 21 U.S.C. §§ 841(a)(1) and 846 |
| 1.  JORGE GUTIERREZ, | ) | Conspiracy to Distribute Five (5) Kilograms |
| (Count 1) | ) | or More of Cocaine |
| | ) | |
| 2.  JAMIN D. OLIVA-MADRID, | ) | Count 2 - 21 U.S.C. § 841(a)(1) |
| (Count 1) | ) | Possession With The Intent to Distribute Five-Hundred (500) Grams or More of Cocaine |
| | ) | |
| 3.  AUGUSTIN ORTIZ, | ) | |
| a/k/a "Tino", | ) | Counts 3 and 4 - 21 U.S.C. § 841(a)(1) |
| (Count 1) | ) | Distribution of Five-Hundred (500) Grams or More of Cocaine |
| | ) | |
| 4.  ESTEBAN SALGUERO-ORTIZ, | ) | |
| a/k/a "Cadejo", | ) | |
| (Count 1) | ) | Forfeiture Notice – 21 U.S.C. § 853 |
| | ) | |
| 5.  FNU LNU 1, | ) | |
| a/k/a "Guero", | ) | Judge Cacheris |
| a/k/a Shadai Misael Delgado-Castro, | ) | |
| a/k/a Joseph Michael Diaz, | ) | |
| (Count 1) | ) | |
| | ) | |
| 6.  ERNESTO MORA-OROZCO | ) | |
| a/k/a "Luis", | ) | |
| a/k/a Luis Rodriguez-Mora, | ) | |
| (Counts 1-2) | ) | |
| | ) | |
| 7.  DARWIN OLIVA, | ) | |
| (Counts 1, 3-4) | ) | |
| | ) | |
| Defendants. | ) | |

## SUPERSEDING INDICTMENT

July 2010 Term - at Alexandria, Virginia

THE GRAND JURY CHARGES THAT:

## COUNT ONE

A.    **THE CONSPIRACY**

Beginning in or about August 2009, and continuing thereafter up to and including on or about June 4, 2010, the exact dates being unknown to the grand jury, in the Eastern District of Virginia and elsewhere, the defendants, JORGE GUTIERREZ, JAMIN DODAMIN OLIVA-MADRID, AUGUSTIN ORTIZ, a/k/a "Tino", ESTEBAN SALGUERO-ORTIZ, a/k/a "CADEJO", FNU LNU 1, a/k/a "Guero" a/k/a Shadai Misael Delgado-Castro a/k/a Joseph Michael Diaz, ERNESTO MORA-OROZCO a/k/a "Luis" a/k/a Luis Rodriguez-Mora, and DARWIN OLIVA, did unlawfully, knowingly and intentionally combine, conspire, confederate, and agree among themselves and with others, both charged and uncharged and known and unknown to the grand jury, including but not limited to Juan Beiza, Javier Maldonado, Abel Maldonado, Rufino Oliva-Madrid, Manuel Alberto Vasquez, Jose Vasquez-Reyes, Ramon L. Collazo, and Nuria Argueta-Martinez, to unlawfully, knowingly and intentionally distribute five (5) kilograms or more of a mixture and substance containing a detectable amount of cocaine, a Schedule II controlled substance, in violation of Title 21, United States Code, Section 841(a)(1).

(All in violation of Title 21, United States Code, Section 846).

**B.**   **PURPOSE AND GOALS OF THE CONSPIRACY**

The primary purpose of the conspiracy was to make as much money as possible through the distribution of cocaine in the Eastern District of Virginia and elsewhere. The named defendants herein, and co-conspirators not indicted, acquired, sold and re-distributed quantities of cocaine in Texas, Arkansas, Virginia and Pennsylvania. It was a goal of the conspiracy to maintain a regular supply of cocaine by repeatedly acquiring multi-kilogram quantities of cocaine from Mexico for importation into the United States. The conspirators sought to create and maintain markets for cocaine to ensure the regular distribution of cocaine within the United States.

**C.**   **WAYS, MANNERS AND MEANS TO ACCOMPLISH THE CONSPIRACY**

1.    The members of the conspiracy assumed various roles based upon the needs of the conspiracy to accomplish the goal of acquiring and redistributing multiple kilograms of cocaine for profit.

2.    GUTIERREZ and R. Oliva-Madrid at times either directly or indirectly managed or supervised the affairs of the conspiracy. However, GUTIERREZ and R. Oliva-Madrid also performed tasks in the operation of the conspiracy such as, but not limited to, transporting drugs, selling drugs, receiving money, transporting money, protecting the organization from police detection, and communicating information concerning the organization and its members.

3.    The members of the conspiracy knowingly and intentionally distributed and possessed with the intent to distribute cocaine at various locations in the Commonwealth of Virginia, the State of Texas, the State of Arkansas, the Commonwealth of Pennsylvania and elsewhere.

3

4.     The responsibility for the acquisition of multi-kilograms of cocaine was primarily controlled by GUTIERREZ, who was based in Austin, Texas. GUTIERREZ maintained a source for multi-kilogram shipments of cocaine in Mexico, with whom he maintained contact during the conspiracy.

5.     Throughout the duration of this conspiracy, GUTIERREZ periodically traveled to Mexico to purchase multi-kilograms quantities of cocaine from his source of supply and he facilitated the transport of the cocaine into the United States from Mexico. GUTIERREZ also facilitated the transport of money from the United States to Mexico.

6.     GUTIERREZ also traveled by commercial aircraft and other means from Texas to the Eastern District of Virginia during the conspiracy to distribute cocaine and to resolve, or assist in resolving, issues with the interstate delivery of cocaine.

7.     R. Oliva-Madrid, J. OLIVA-MADRID and D. OLIVA are brothers who worked together and with other conspirators to distribute cocaine in Virginia and Pennsylvania during and related to this conspiracy. The brothers supplied cocaine, or facilitated the supply of cocaine, to other wholesale dealers.

8.     MORA-OROZCO and Vasquez-Reyes were regularly supplied with multi-kilogram quantities of cocaine by the OLIVA-MADRIDS during the conspiracy for re-distribution in Loudoun County, Virginia, the City of Alexandria, Virginia, and elsewhere.

9.     J. Maldonado, among other roles, was the primary transporter of cocaine and money between Austin, Texas and the Eastern District of Virginia. At various times during the conspiracy, A. Maldonado, Beiza, ORTIZ, and Manuel Vasquez also assisted in the interstate transport of cocaine.

4

10.     SALGUERO-ORTIZ and GUERO sold cocaine in Pennsylvania on behalf of GUTIERREZ and R. Oliva-Madrid.

11.     Collazo acquired cocaine from co-conspirators and re-sold the cocaine for profit.

12.     Argueta-Martinez, among other roles and acts, brokered cocaine transactions on behalf of R. Oliva-Madrid.

13.     One of the venues ("stash house") where cocaine was stored and sold during the conspiracy is located at 46298 John Mosby Highway, in Chantilly Virginia. This is the location of JD Granite Countertops, a company owned and operated by J. OLIVA-MADRID.

14.     The venues ("stash houses") used during this conspiracy to sell and store cocaine were also used for processing, cutting, packaging and distributing the organization's cocaine, and for counting and storing money and other items of value.

15.     It was part of the conspiracy that the defendants and their co-conspirators, both known and unknown to the Grand Jury, played different roles and took upon themselves various tasks and participated in the affairs of the conspiracy through various criminal acts.

16.     It was part of the conspiracy that the defendants made themselves and their services available at various times throughout the life of the conspiracy on an "as needed" basis and participated in certain drug trafficking crimes as required to protect and promote the illegal drug distribution operation.

17.     It was part of the conspiracy that the roles assumed by some defendants were interchangeable at various times. Some of the roles assumed and carried out by the defendants included, among others, supplier of cocaine, packager, transporter, driver, manager, supervisor, broker, negotiator, money launderer and street seller.

5

18.     It was part of the conspiracy that the members transported cocaine secreted within vehicles.

19.     It was part of the conspiracy that the defendants communicated with their conspirators by mobile telephones to discuss matters related to the drug-trafficking conspiracy, including, among other things, quantity, price, locations, times and frequency.

20.     It was part of the conspiracy that the conspirators also met in various locations throughout the metropolitan Washington, D.C. region and elsewhere to arrange cocaine transactions.

21.     It was part of the conspiracy that the members of the conspiracy often communicated in coded language to conceal the nature of their illegal activities. For example, at various times the following words, among others, refer to cocaine: "paint"; "houses"; "girls"; "kitchens"; "cars"; "stilts"; "work"; and "chicken."

## C.     OVERT ACTS IN FURTHERANCE OF THE CONSPIRACY

In furtherance of the conspiracy and in order to effect the goals and purposes of the conspiracy, the defendants, other co-conspirators not indicted herein, and others who are known and unknown to the grand jury, in various combinations, directly and indirectly, within the Eastern District of Virginia and elsewhere, committed overt acts, including, but not limited to the following:

1.     In or about August 2009, GUTIERREZ directed on two occasions that shipments of approximately three kilograms of cocaine be delivered from Austin, Texas, to R. Oliva-Madrid for further distribution within the Eastern District of Virginia.

2.     On or about August 18, 2009, GUTIERREZ flew with a one-way ticket aboard a

6

USAirways flight from Austin, Texas to Dulles International Airport within the Eastern District of Virginia in order to oversee the drug trafficking operation.

3.      On or about September 1, 2009, GUTIERREZ flew with a one-way ticket aboard a USAirways flight from Austin, Texas, to Dulles International Airport within the Eastern District of Virginia in order to oversee the drug trafficking operation.

4.      On or about September 2, 2009, A. Maldonado was paid approximately $2,000.00 for transporting cocaine from Austin, Texas, to the Eastern District of Virginia on behalf of the organization.

5.      On or about September 22, 2009, GUTIERREZ flew with a one-way ticket aboard a USAirways flight from Austin, Texas, to Dulles International Airport within the Eastern District of Virginia in order to oversee the drug trafficking operation.

6.      On or about December 1, 2009, the exact dates being unknown to the Grand Jury, J. Maldonado traveled from Austin, Texas, to the Eastern District of Virginia with multiple kilograms of cocaine and marijuana and made statements that he delivered ten (10) kilograms of cocaine and fifty (50) pounds of marijuana.

7.      On or about December 8, 2009, R. Oliva-Madrid sold one (1) pound of marijuana for $840.00 and possessed approximately three (3) additional pounds of marijuana and five (5) ounces of cocaine.

8.      On or about December 16, 2009, R. Oliva-Madrid, sold approximately one-half (½) pound of marijuana for $350.00. During the transaction, R. Oliva-Madrid made statements that his man (referring to J. Maldonado) was *en route* from Texas with another shipment of cocaine.

7

9.      On or about December 16, 2009, R. Oliva-Madrid made further statements that J. Maldonado was traveling from Texas with approximately ten (10) kilograms of cocaine.

10.     On or about December 30, 2009, J. Maldonado traveled from Texas to Virginia with cocaine and made statements that he transported twelve (12) kilograms of cocaine.

11.     Between January 19, 2010 and January 20, 2010, J. Maldonado traveled from Texas to Virginia with cocaine.

12.     On or about January 22, 2010, R. Oliva-Madrid made statements that he had cocaine for sale.

13.     On or about January 22, 2010, D. OLIVA and J. Maldonado sold approximately four (4) ounces of cocaine for $4,000.00.

14.     On or about January 29, 2010, J. Maldonado made statements that he had cocaine for sale.

15.     On or about February 2, 2010, GUTIERREZ flew with a one-way ticket aboard a USAirways flight from Austin, Texas, to Dulles International Airport within the Eastern District of Virginia in order to oversee the drug trafficking operation.

16.     On or about February 3, 2010, R. Oliva-Madrid made statements offering to sell one (1) kilogram of cocaine.

17.     On or about February 3, 2010, R. Oliva-Madrid made statements that he and J. Maldonado were all on the same team working together.

18.     On or about February 22, 2010, J. OLIVA-MADRID delivered approximately $7,000.00 in drug proceeds to GUTIERREZ by wire transfer.

19.     On or about February 28, 2010, R. OLIVA-MADRID offered to sell one (1)

8

kilogram of cocaine.

20.    On or about February 28, 2010, R. OLIVA-MADRID made statements that J. Maldonado would soon travel to Virginia with cocaine.

21.    On or about March 9, 2010, GUTIERREZ flew with a one-way ticket aboard a USAirways flight from Austin, Texas, to Dulles International Airport within the Eastern District of Virginia in order to oversee the drug trafficking operation.

22.    Between March 9, 2010, and March 10, 2010, J. Maldonado traveled from Texas to Virginia.

23.    On or about March 10, 2010, R. Oliva-Madrid delivered a bag of suspected cocaine to MORA-OROZCO.

24.    On or about March 11, 2010, J. Maldonado and D. OLIVA sold a quarter kilogram (1/4) of counterfeit cocaine for $8,700.00.

25.    Sometime between March 11, 2010 and March 15, 2010, J. Maldonado made statements that the organization took delivery of a shipment of bad cocaine.

26.    On or about March 15, 2010, while he was with D. OLIVA, J. Maldonado made statements that he left Virginia and that he was getting better cocaine.

27.    On or about March 16, 2010, J. Maldonado and D. OLIVA arrived in Austin Texas.

28.    On or about March 22, 2010, a Chevrolet Silverado vehicle used by the organization to transport cocaine traveled from Austin, Texas to Little Rock, Arkansas to Virginia.

29.    On or about March 23, 2010, GUTIERREZ flew with a one-way ticket aboard a

USAirways flight from Austin, Texas, to Dulles International Airport within the Eastern District of Virginia in order to oversee the drug trafficking operation.

30.     On or about March 24, 2010, at approximately 8:30 a.m., R. Oliva-Madrid and Beiza arrived at a residence in Sterling, Virginia in the Chevrolet Silverado vehicle.

31.     On or about March 30, 2010, R. Oliva-Madrid distributed approximately two (2) ounces of cocaine in Chantilly, Virginia.

32.     On or about March 30, 2010, R. Oliva-Madrid made statements that J. Maldonado was delivering another shipment of cocaine on April 5, 2010, that the quality would be very good, and that the price would be higher.

33.     On or about April 7, 2010, J. Maldonado delivered a shipment of cocaine to R. Oliva-Madrid at his residence in Sterling, Virginia.

34.     On or about April 7, 2010, R. Oliva-Madrid made statements to Vasquez-Reyes that the Boss (GUTIERREZ) was in Virginia and that cocaine was available.

35.     On or about April 7, 2010, R. Oliva-Madrid and GUTIERREZ delivered cocaine to MORA-OROZCO in Alexandria, Virginia.

36.     On or about April 7, 2010, R. Oliva-Madrid and GUTIERREZ delivered three (3) kilograms of cocaine to Vasquez-Reyes in Ashburn, Virginia.

37.     On or about April 8, 2010, R. Oliva-Madrid made statements to J. OLIVA-MADRID that GUTIERREZ was concerned that J. OLIVA-MADRID was selling cocaine too slowly.

38.     On or about April 8, 2010, Collazo sold 250 grams of cocaine that he received from MORA-OROZCO in furtherance of the conspiracy.

39.     On or about April 9, 2010, MORA-OROZCO made statements in coded language to R. Oliva-Madrid that he had collected enough money to pay GUTIERREZ, but that he had not collected enough money to pay R. Oliva-Madrid.

40.     On or about April 10, 2010, R. Oliva-Madrid, J. Maldonado, and Beiza traveled to Philadelphia, Pennsylvania.

41.     On or about April 10, 2010, while in Philadelphia, R. Oliva-Madrid and GUERO, a Philadelphia based co-conspirator, engaged in a telephone conversation concerning the price and quantity of cocaine.

42.     On or about April 11, 2010, MORA-OROZCO made statements to R. Oliva-Madrid that he had drug proceeds to deliver.

43.     On April 11, 2010, MORA-OROZCO and R. Oliva-Madrid met and they exchanged money and cocaine.

44.     On April 11, 2010, J. Maldonado, GUTIERREZ and Beiza departed R. Oliva-Madrid's residence in Sterling, Virginia in a Chevrolet Silverado transporting the proceeds of cocaine trafficking.

45.     On or about April 13, 2010, D. OLIVA picked-up cocaine proceeds from MORA-OROZCO and delivered the proceeds to R. Oliva-Madrid.

46.     On or about April 13 and April 14, 2010, R. Oliva-Madrid and Philadelphia based conspirators GUERO and SALGUERO-ORTIZ engaged in conversations concerning the rental of a cocaine stash house.

47.     On April 14, 2010, R. Oliva-Madrid wired $1,000.00 to GUERO as payment for a rental cocaine stash house.

11

48.     On April 14, 2010, J. OLIVA-MADRID purchased with drug-trafficking proceeds a Toyota "4-Runner" sport utility vehicle from a car dealership for $33,215.00 in the Eastern District of Virginia. J. OLIVA-MADRID delivered $6,000.00 in United States Currency and a JD GRANITE COUNTERTOPS check in the amount of $9,000.00 to the car dealership at 10:41 a.m. That evening J. OLIVA-MADRID delivered an additional $12,015.00 in United States Currency and a personal check in the amount of $6,200.00 to the car dealership to complete the transaction.

49.     On or about April 15, 2010, J. MALDONADO, while in Austin, Texas, made statements to R. Oliva-Madrid that cocaine was "here" but that GUTIERREZ does not want to send him (to Virginia) because El Tio does not want J. MALDONADO traveling by himself.

50.     On or about April 16, 2010, R. OLIVA-MADRID made statement to J. OLIVA-MADRID that he was going to meet with RODRIGUEZ-MORA to pick-up money.

51.     On or about April 16, 2010, R. Oliva-Madrid entered MORA-OROZCO's residence without any packages or bags, and he left the residence carrying a bag with money.

52.     On or about April 20, 2010, GUTIERREZ and R. Oliva-Madrid made statements to each other, using coded language, about Manuel Vasquez's ability to process cocaine. GUTIERREZ made statements that Manuel Vasquez is very good at fixing cocaine.

53.     On or about April 21, 2010, GUTIERREZ made statements using coded language to R. Oliva-Madrid that he was traveling to Virginia and that J. Maldonado and ORTIZ were ten (10) hours behind him transporting six (6) kilograms of cocaine. GUTIERREZ made further statements, again using coded language, to R. Oliva-Madrid that they can distribute the six (6) kilograms in one day but that additional cocaine would be available the following week.

54.     On or about April 22, 2010, J. Maldonado made statements to R. Oliva-Madrid that he had entered Virginia and that he would arrive at R. Oliva-Madrid's residence in the afternoon.

55.     On or about April 22, 2010 at approximately 6:14 p.m. J. Maldonado arrived at R. Oliva-Madrid's residence driving a Chevrolet Silverado.  J. Maldonado parked the Chevrolet Silverado in the garage of the residence.

56.     On or about April 22, 2010, at approximately 6:18 p.m., R. Oliva-Madrid made statements to MORA-OROZCO that they would be ready (with cocaine) soon.

57.     On or about April 22, 2010, at approximately 6:52 p.m., MORA-OROZCO, using coded language, made statements to R. Oliva-Madrid that he wanted three (3) kilograms of cocaine immediately and that he would take an additional kilogram the following day.

58.     On or about April 22, 2010, at approximately 8:45 p.m., R. Oliva-Madrid and GUTIERREZ delivered cocaine to MORA-OROZCO at his residence in Alexandria, Virginia.

59.     On or about April 23, 2010, R. Oliva-Madrid agreed to sell one-half (½) kilogram of cocaine for $12,000.00.

60.     On or about April 23, 2010, D. OLIVA delivered one-half (½) kilogram on behalf of R. Oliva-Madrid.

61.     On or about April 24, 2010, SALGUERO-ORTIZ, a Philadelphia co-conspirator, made statements to R. Oliva-Madrid that they were prepared to rent a cocaine stash house and that he could sell kilograms of cocaine for R. Oliva-Madrid.

62.     On or about April 24, 2010, R. Oliva-Madrid and J. OLIVA-MADRID delivered cocaine to SALGUERO-ORTIZ and GUERO in Philadelphia, Pennsylvania.

63.     On or about April 26, 2010, unindicted co-conspirator-1 made statements to R. Oliva-Madrid concerning the purchase of cocaine from R. Oliva-Madrid.

64.     On or about April 26, 2010,  unindicted co-conspirator-1 purchased one (1) kilogram of cocaine from R. Oliva-Madrid for $26, 000.00.

65.     On or about April 30, 2010, R. Oliva-Madrid made statements that he had one (1) kilogram of cocaine remaining and that additional cocaine would be available in three (3) weeks.

66.     On or about May 4, 2010, VASQUEZ-REYES distributed cocaine in Herndon, Virginia.

67.     On or about May 8, 2010, GUERO made statements to R. Oliva-Madrid that he distributed 62 grams of cocaine.

68.     On or about May 8, 2010, R. Oliva-Madrid made statements to GUERO that another shipment of cocaine would arrive soon.

69.     On or about May 9, 2010, GUTIERREZ made statements to R. Oliva-Madrid that he was sending eight (8) kilograms of cocaine to R. Oliva-Madrid.

70.     On or about May 9, 2010, R. Oliva-Madrid made statements to Argueta-Martinez that cocaine would be available on Tuesday for her customer and that the price would be $32,000.00 for a kilogram or $16,000.00 for one-half (½) kilogram.

71.     On or about May 10, 2010, R. Oliva-Madrid made statements to MORA-OROZCO that he was going to pick-up the boss (GUTIERREZ) at 5:30 and that MORA-OROZCO should get the guys ready and he should let the Baltimore customer know.

72.     On or about May 10, 2010, J. Maldonado made statements to R. Oliva-Madrid that he would be arriving soon with cocaine and that the quality of the cocaine was high.

73.    On or about May 10, 2010, J. Maldonado delivered eight (8) kilograms of cocaine to R. Oliva-Madrid at his residence in Sterling, Virginia.

74.    On or about May 10, 2010, GUTIERREZ and R. Oliva-Madrid delivered cocaine to VASQUEZ-REYES in Ashburn, Virginia.

75.    On or about May 11, 2010, D. OLIVA delivered cocaine to MORA-OROZCO in Annandale, Virginia.

76.    On or about May 11, 2010, MORA-OROZCO distributed cocaine to a customer in Hyattesville, Maryland.

77.    On or about May 11, 2010, MORA-OROZCO made statements to R. Oliva-Madrid about acquiring another kilogram of cocaine.

78.    On or about May 11, 2010, D. OLIVA delivered cocaine to MORA-OROZCO.

79.    On or about May 11, 2010, MORA-OROZCO made statements to GUTIERREZ that he will deliver money to him.

80.    On or about May 11, 2010, J. Maldonado and ORTIZ left Virginia and traveled to Austin, Texas.

81.    On or about May 12, 2010, R. Oliva-Madrid and GUERO made statements about the distribution of a kilogram of cocaine.

82.    On or about May 14, 2010, GUTIERREZ made statements to R. Oliva-Madrid about traveling to Mexico and a future delivery of ten (10) kilograms of cocaine.

83.    On or about May 17, 2010, R. Oliva-Madrid and Argueta-Martinez made statements about the distribution of two (2) ounces of crack cocaine.

84.    On or about May 17, 2010, R. Oliva-Madrid and GUERO made statements about

15

the process of converting cocaine to cocaine base.

85.     On or about May 22, 2010, GUTIERREZ made statements to R. Oliva-Madrid that he was at the line returning from Mexico and that the cocaine had crossed the border.

86.     On or about May 24, 2010, GUTIERREZ made statements to R.Oliva-Madrid that he was sending seven (7) kilograms of cocaine to Virginia the next day.

87.     On or about May 25, 2010, GUTIERREZ flew aboard a USAirways flight from Austin, Texas, to Dulles International Airport within the Eastern District of Virginia in order to oversee the drug trafficking operation.

88.     On May 25, 2010, J. Maldonado and A. Maldonado departed Austin, Texas *en route* to Sterling, Virginia with seven (7) kilograms of cocaine secreted in their vehicle.

89.     On May 27, 2010, Manuel Vasquez made statements to R. Oliva-Madrid about picking-up GUTIERREZ at the airport and Manuel Vasquez told R. Oliva-Madrid to erase his phone number.

90.     On June 4, 2010, J. OLIVA-MADRID possessed with the intent to distribute approximately 460 grams of cocaine within his business – JD GRANITE COUNTERTOPS – located at 46298 John Mosby Highway within the Eastern District of Virginia.  The defendant also possessed on June 4, 2010, items consistent with the distribution of cocaine, such as "cutting" agents, packaging material and an electronic scale.

THE GRAND JURY FURTHER CHARGES THAT:

## COUNT TWO

On or about June 4, 2010, within the Eastern District of Virginia, the defendant

ERNESTO MORA-OROZCO a/k/a "Luis" a/k/a Luis Rodriguez-Mora did unlawfully,

knowingly and intentionally possess with the intent to distribute 500 grams or more of a mixture

and substance containing a detectable amount of cocaine, a Schedule II controlled substance.

(In violation Title 21, United States Code, Section 841(a)(1)).

THE GRAND JURY FURTHER CHARGES THAT:

## COUNT THREE

On or about May 11, 2010, within the Eastern District of Virginia, the defendant

DARWIN OLIVA did unlawfully, knowingly and intentionally distribute 500 grams or more of a

mixture and substance containing a detectable amount of cocaine, a Schedule II controlled

substance.

(In violation Title 21, United States Code, Section 841(a)(1)).

18

THE GRAND JURY FURTHER CHARGES THAT:

## COUNT FOUR

On or about April 23, 2010, within the Eastern District of Virginia, the defendant

DARWIN OLIVA did unlawfully, knowingly and intentionally distribute 500 grams or more of a

mixture and substance containing a detectable amount of cocaine, a Schedule II controlled

substance.

(In violation Title 21, United States Code, Section 841(a)(1)).

## FORFEITURE

As a result of committing the crimes alleged in the Indictment, the defendants herein shall

forfeit to the United States any property constituting, or derived from, any proceeds the

defendants obtained, directly or indirectly, as the result of such violation, and any of the

defendants' property used, or intended to be used, in any manner or part, to commit, or to

facilitate the commission of such violation, including, but not limited to $1,250,000.00 in United

States currency, representing the amount of proceeds obtained as a result of the controlled

substance offenses charged herein for which the defendants are liable.

If any of the property described above as being subject to forfeiture, as a result of any act

or omission of the defendants:

    a.    cannot be located upon the exercise of due diligence;

    b.    has been transferred or sold to, or deposited with, a third party;

    c.    has been placed beyond the jurisdiction of the court;

    d.    has been substantially diminished in value; or

    e.    has been commingled with other property which cannot be divided without

        difficulty;

it is the intention of the United States, pursuant to Title 21, United States Code, Section 853(p),

to seek forfeiture of any other property of the defendant up to the value of the forfeitable

property.

(Pursuant to Title 21, United States Code, Sections 846 and 853)

A TRUE BILL:

Pursuant to the E-Government Act,
the original of this page has been filed
under seal in the Clerk's Office.

FOREPERSON

20

NEIL H. MACBRIDE
UNITED STATES ATTORNEY

Dennis M. Fitzpatrick
Assistant United States Attorney

Karen L. Dunn
Assistant United States Attorney